May it please the Court, Joan Levy appearing on behalf of the appellant Ron Vaughn, Jr. I would like to reserve five minutes for rebuttal. All right. Your clock is there. Okay. Thank you. And I'll try to help you as well. Thank you. First, I would like to just make a brief response to the government's 28J letter, the cases that they cited. There were three cases. One was United States v. CRUPA, which actually arose from the Eastern District of California, which is where we are. And this case was cited by the government for deference to the magistrate regarding probable cause for a search warrant. And I would just like to comment that that case is not analogous to the case at Barr. This was a case involving an investigation on an Air Force base, a military base, where there was a complaint of children being neglected by the mother of the children. And so the investigator responded and found that there was no custodial parent and that there was a strange civilian man at home with the children who didn't have any ties to the military. They found 14 computers and a consensual search turned up. At least one picture of a nude teenager. It was not made clear whether that was a minor or not. So there was a search warrant granted, and the court, the district court, did find in that case that there was probable cause, but our case is distinguishable. That case pertained to a military environment. It wasn't a civilian status case. The report of child neglect was suspicious. There was no reports of child neglect in the case at Barr. There was one actual image found on the computer during the consensual search. In Mr. Vaughan's case, there were no images found during the consensual search. It was just a matter of some file titles that pointed to music videos. And they felt that the number of computers was unusually large. And the key difference between the two cases is, in that case, in the search warrant affidavit, the agent did not give any false or misleading information to the magistrate, which we argue happened in Mr. Vaughan's case. The other issue is that the other issue is that the other issue is that the other issue is that the other issue is that the other issue is that the other issue is that the to be recoverable, on the computer. A lot of focus on that. Our precedent suggests that one of the ways we benchmark that is whether there would be a fair probability that somebody's committed the crime. So in other words, is this evidence such that it might lead you to say there's a fair probability? Would you discuss the movie titles in that regard? As opposed to whether you absolutely could or couldn't, you know, recover them. But under the standard that we have to look at it in terms of the warrant. Well, I believe that there was not a substantial basis shown for the search warrant. And there are some cases supporting that. The affidavit was 29 pages long. There was only four pages that applied to the investigation and the description. Virtually all of the other 25 pages were primarily boilerplate about collectors and pedophiles and the experience of the investigator. And, you know, the same types of things that are in every single search warrant. The affidavit did not contain any information about the toxicity of the relationship between Mr. Vaughn and Ms. Ramirez. So the movie titles, the movie titles were not recovered, or the movie images, pornographic movie images were not recovered. They weren't recovered until – and even at the time that there was recovery, which was nine months after the search warrant, there weren't even full images. They were just thumbnail images. And we have cases that say that there has to be more than just – you can't use evidence of some – or you can't use descriptions of collectors and pedophiles to justify looking for collections, you know, and images. That there has to be more. And – Well, but if I were an officer and I saw on a computer a movie title, you know, Joe Blow Does Children or something like that, would that not be sufficient to suggest that there may be child pornography? Well, even though – given if you were an officer with knowledge of these kind of movies and this background. I don't think that just a title, which in itself is not illegal, is sufficient indicia of a crime having occurred. Suppose it's a really explicit title. I say the same thing. There's nothing illegal about a really explicit title. And the title is text, and I never made any kind of First Amendment argument, and I don't intend to do that at this point. But I would like to at least distinguish between the actual visual image and the description. So you have a title that says movie of 5-year-old girl being so on and so forth. Well, let me put it this way about the search warrant, and I will go back to what the expert for Mr. Vaughan said, that yes, yes, maybe that was enough to get a search warrant. However, the search warrant has to be complete and truthful and state all of the factors. And, you know, the fact remains that there was a toxic relationship here, and that was not a true statement to the magistrate. The fact remains that the officer, the affiant, said that he currently possessed child pornography. Now, that's compelling to a magistrate. That was not a true statement. And the other fact that needed to, you know, I think be emphasized was that she provided 120 disks of all kinds of images, and there was no child pornography in any of those disks. And so I think what the magistrate needed to do, and maybe wasn't provided the opportunity to do that, was to weigh the unreliability of this jilted lover with this title, which when you clicked on it, brought up a music video, three music videos. So I would maintain that that alone is not sufficient probable cause unless the entire picture is brought to the magistrate so that the magistrate has an opportunity to weigh and balance. So if where the one of them is a title is PTHC, that is not sufficient to justify a search warrant, even though that's a very common term and Mr. Vaughan would have said, well, that's a crime unit of the sheriff's office. Well, I think that there has to be more than just the title for the very reason. I mean, if we look at it with hindsight, there This title has shown up in a number of other cases that this Court has seen involving child pornography. This title is not unknown to us. And so when you have people who are dealing in child pornography who saw a title that said PTHC and that is a well-known acronym, why wouldn't that be justification to go and get a search warrant? Now, if that was in the context of the whole picture, the whole reason for the investigation, I might agree with you. But I don't think it's sufficient, as I said, to just have a title when, you know, he said, you know, that bitch set me up. Well, you know, maybe that's true, maybe it wasn't. But I think it's very important when that is said for the magistrate to have a clear picture that somebody might have put it out there trying to be the victim. I don't see how that affects the search warrant issue at all. The fact that something – I mean, frankly, it suggests that he will find something on the computer. The bitch set him up by putting something on the computer. We know the title was put on the computer because that's what he had been told. But in terms of the search warrant, is it likely that evidence of misconduct of criminal activity will be found? The answer screams out yes. It may have been by the bitch. But somebody, if you take that title as being suggestive that something criminal will be found, I don't see how that undercuts the search warrant at all. It may point the finger at somebody else, but the likelihood of finding something criminal on the computer seems pretty strong at that point. Well, particularly when you have an agent who said that he did possess child pornography, given the circumstances of the title of the matter there. Well, let's disregard that for a second. I mean, at that point, isn't there enough right there? Isn't that enough, the combination of the title and the bitch set me up? Isn't there a reasonable possibility or probability that something criminal is going to be found on that computer? Possibly, but I – but this search warrant was improperly drawn. Well, I understand you have other arguments, and I'm trying to preclude those. Arguments. But focusing on this piece, somehow it seems to me we're kind of past this piece and maybe we need to get to your other arguments. But as to that piece, it seems to me there's enough evidence that – or enough reason to suspect that evidence of criminal activity will be found by looking at the computer, which is enough to justify the search warrant. Now, you may have – you do have other arguments, other arguments with regard to exactly how this warrant was obtained. Yes. I'm not trying to close the door on those. I have it all lumped together, saying was there probable cause for the search warrant to have been issued by the magistrate. Okay. That's the issue I'm dealing with. I think at this point, it sounds like there's probable cause. Now, the question is, did the application to the magistrate where he makes that determination, are there other reasons why that's flawed? Well, I definitely think that that was flawed. I mean, I think that – and I particularly – see, I can understand the magistrate issuing it based on what she had in front of her. Well, I can understand the magistrate issuing it based on the title of the bitch setting me up. But I think after, you know, the Franks hearing, I think the district court should that, yes, Agent Prado erred in his – in the way he wrote his affidavit. However, he didn't consider it reckless. He considered it merely negligent and not enough to dissuade him from the magistrate's finding. So where – which of the statements, omissions or misleading statements, would you point to that would suggest that was really clearly erroneous determination of the Franks? Well, I think first of all, there was the statement that he was currently in possession of child pornography on the laptop, and I believe that was on paragraph 7, I think, and that the movie file was recoverable. Again, an assertive statement. The movie file was recoverable when, in fact, it was never ever recovered, to this date never recovered. But at that stage, he believed that, correct? Well, he shouldn't have, because Wienst, who was the forensic investigator at the time, claims that he never said that it was recoverable. What he said is that he has about a 25 percent chance to, when he brings it back to the lab, to be able to find child porn. So that means there's a 75 percent chance that he cannot. So when you have an affirmative statement saying that the movie file was recoverable, again, this is real ammunition for the magistrate. That plus saying he's currently in possession, which implies that something was found there. The currently in possession, paragraph 7, is followed by a sentence that says the investigation has revealed that probable cause exists, indicating that child pornography is located. So it goes immediately, it immediately sort of corrects itself to say we've got probable cause. None of that, of course, of the details. That's simply a conclusion, not the details. The details are found back around paragraphs about 16, 17, 18. 17 is the one that contains the PTHC, which I use just as a sort of a shorthand for saying, look, this is a pretty good indicator that he's got – this is certainly worth looking into when a guy has a file that's called PTHC, because we know what that title means in the sex industry. So in paragraph 17, the affidavit explains the basis for believing that there is probable cause to want to search this. I agree that the sentence – that the first sentence in paragraph 7 is misleading, but it states a conclusion, not the – and not the evidence on which it's based. The evidence is later on and indicates they have some indicia of wrongdoing, but not the hard proof. Well, I don't disagree with you that those titles definitely refer to something that is known generally in the community as child pornography. That's not my argument, and it never has been. But the argument is that here, that they had previously been deleted but still accessible. That's – and that's which paragraph? That's on the very bottom of page 18. It starts on the bottom of page 18. That's paragraph 17. And this is paragraph 17, and then continues on to the first line of page 19. That's where he's describing what he used as, quote, lost files. I'll read that whole sentence. During the on-site examination, Detective Wiens observed four previously saved movie files, blah, blah, blah, classified as lost, meaning that they had previously been deleted but still accessible. And that is a blatant untruth. They have never been accessed. I'm running out of time, and I have so many things to say. I know you have a lot of issues. You're welcome to use your time now. We're on rebuttal. It's your choice. Well, I've got three minutes. Let me see what I can get to. I would like to talk a little bit about the sentencing and go on to that, and just say very briefly that I believe, in my interpretation, that the district court's sentence was procedurally unreasonable. I will modify my argument, not because I've changed my opinion, but I think a better argument than saying that the unconstitutionality, you know, through the Feeney Sentencing Commission, to add these specific enhancements, I would say instead that I would agree with the Dorvey case that judicial deference is, should be lessened, that there should not be as much deference to that sentencing guideline based on how it was promulgated, not by the Sentencing Commission after empirical studies, but directly through Congress as a policy measure there. I think what Congress should have done was, in the amendment, stated its policy concerns and stated, you know, its opinion that sentencing should be harsh, and then left it up to the commission to determine what those sentencing enhancements should or should not be. And I went through considerable length in the briefs and in citing to other sources about the number of changes to the 2G2.2 sentencing enhancements over the years, and how they've become increasingly more harsh. And I think one of the problems with that is that now, in this computer internet age, many of those enhancements are for particulars that are inherent in the crime itself, particularly, well, use of a computer, number of images. All of that has become so – I won't belabor that, but I wanted to stress that I think that some of these enhancements are not deserving of the same deference that we give to others. I wanted to ask you about your motion to seal. My motion to seal the record? Oh, to seal. Oh, yes. You have such a motion, correct? The – I haven't – And the briefs have been filed under seal. The briefs are filed under seal. You had a motion to seal. Right. The question is whether they should remain sealed. Well, I mean, I'm going to run out of time, but I want to – you know, my client – the very thing that we sought to preclude occurred in his former custody location, where information got out as to who he was, what he had done, what his charges were, and he was threatened. And he had to go into administrative security for months until he was moved to a different site. And those months meant pretty much 24-7, just locked up in a cell with no contact. So our concern is the press, because it was the press that was – that was writing up articles. And it just so happened that people from Fresno were in the same prison that he was, and their family was sending them – and it was more than one – were sending them newspaper accounts. He's – so far, he's been fine in the new place. But I would want to keep things sealed because I wouldn't want anything to get out to the press as a result of today's hearing or whatever the outcome is to put him in danger again. I'm kind of baffled as to what we can do, though. I mean, even if we could figure out a way to write a disposition that didn't make explicit reference to the facts or perhaps even the name of the crime, the fact of our disposition – I see no way for it not to be public. And if the newspaper in Fresno decides to print because it already knows the underlying That's kind of beyond anything we can control. So at this point, I'm not sure what it is that should be sealed. Is there any way to redact his name or use his – use him in one of the non-annualities? We'll consider it. Pardon me? But, you know, usually that's done for juveniles. I know. I know. But I – the reason I'm so concerned is because it already happened, and so what's to preclude it from happening again? Your concern is the underlying facts of what he did or the fact of his prior employment? Pretty much the prior employment. But when you couple that with what he was convicted of, it kind of doubles the chance of trouble. But it was – I mean, I know his PSR was redacted. But the trial – the trial took place in a public courtroom. Correct. In a public courtroom. And the district court records are not sealed. And the district court records are not sealed. Right. Thank you. We'll hear from the government. Okay. Thank you. You seem anxious to get up here. Welcome. Good morning. David Gappa for the United States. I would first like to address a few preliminary matters. I gave the courtroom deputy a screen print that shows that the government's 28J letter is actually 347 words. I know counsel had a reference that it exceeded the number of words it does not. It's 347. So it does, in our view, comply with the letter of 28J. But also in the reply letter from counsel on the 28J letter, there is reference to the Krupa case having been issued in 2010. It was submitted then but not issued until 2011. And, in fact, there was a panel decision which was vacated and then a subsequent panel decision. In the defendant's reply brief, there was reference to the Gord case, similar, where there was a panel decision, which is the one that the defendant has cited in the argument on the probable cause issue. That obviously was vacated. It was replaced with the en banc decision, which this Court is well aware of. So I wanted to put those points on the record. And looking at it. Alito, was Krupa being given to us for anything other than the notion of deference? It seemed to me a pretty broad proposition. So I take it this is the exchange of 28J letters sometimes takes a life of its own. And this may be one of those examples. But is there anything more that Krupa says to us than that? Probably not. It's just to bring the decision to the courts. We get a lot of letters. I look at it.  This is a proposition we know. And I kind of stopped at that point. Correct. But since there were these other two cases which were more recent and had some additional points, the government thought it would be appropriate to just talk about it. I'm not complaining about the submission of the letter. But it's now become a focus of discussion. Both parties have started with it. Usually you start with something that's really key. And this strikes me as a little bit of a sideshow. So. So looking then at the issue of probable cause, I think this Court has focused proper attention on, as the district court did, put aside whatever allegations there were of false or misleading statements. And if you put those aside, as the district court in a sense did, although the district court after that hearing, which spanned parts of seven court days, found that there were no misleading or false statements, at least that rose to the level of reckless or intentional statements that had to be excised. But the court essentially has said, even assuming that were the case, what we are left with then are indisputable facts that would support the issuance of the search warrant, and probable cause could be premised based on those file titles alone. And this Court has looked at those titles. In the government's view, it was indicative of child pornography, but more importantly, both investigators who were at the scene that day, as well as Mr. Vaughn, by looking at reports that he had filed when he was a detective with the sheriff's office, had referenced even PTHC and perhaps some of the other parts of those titles. And then the defendant's own expert, who had been an investigator with, at the time, Immigration, had said, I have investigated child exploitation cases, and if I had come across those titles, they clearly indicate child pornography, and in the course of due diligence, any investigator would have to seek a search warrant. So the district court found that there was a substantial basis for issuance of the search warrant. This Court should find that there was a substantial basis for that search warrant to be issued, and that the findings of the district court, which were articulated both orally and then in writing, are to be given due deference, and they are not clearly erroneous. So we would urge the Court not to change the finding there, that there was probable cause. And looking, as I think the Court noted, the titles alone, as the Third Circuit has noted, are highly descriptive, and in some situations, such as in those cases in the Third Circuit, they could support a finding of probable cause. And the task is not to necessarily say at that point in time that the defendant is guilty. They may not even point to the defendant, but the point is, and as this Court knows, the task is to determine whether or not there is a fair probability that evidence of the commission of a crime would be found at the location to be searched. And just finally, on this point, the Supreme Court has stated that reviewing court should not flyspeck or second-guess search warrant affidavits, and that if the case is doubtful, and we don't believe this one is, that they should be decided in favor of upholding the warrants. Looking at the other issues, the government has submitted that the district court did not abuse its discretion by permitting the cross-examination of the defendant at the Franks hearing. The district court has given wide latitude in determining the scope of cross-examination. That exercise was the discretion was properly exercised in this case, and it was not so far-ranging to be an abuse of discretion. It's important to note that this came in the context of a pretrial hearing, and there was no jury there. And so while the defendant had the right not to testify, he chose to take the stand and then put his credibility at issue. And the district court found that the questions that he was asked on cross-examination related to his credibility. I guess the concern is that if the — it amounts to a shot at — an unusual shot at discovery by the ability to ask questions and assemble information that might be used later if he should testify at trial. And so I'm not sure that the fact the jury is not present — I mean, the jury is never present at this kind of hearing. That doesn't mean that there's not at least some limitation that ought to be imposed on the scope of examination. I agree. And at some point, the district court did sustain objections, I believe, in that he did at some point limit the cross-examination. Now, when looking at the question, I think it's important to note that this was after the defense counsel had substantially cross-examined both Detective Weems and Special Agent Prado, and he specifically said, well, I don't want the court to limit my cross-examination if you're suggesting that we need to speed this along, basically saying I want to take as much time as I think is appropriate. And the court, over the government's objection, granted that additional time and didn't limit the scope of cross-examination of the government witnesses. How long did the French hearing take? It took — I don't have the exact number of minutes, but it took place over the course of seven court days because of the court's hectic schedule. He was trying to fit it in during breaks and at the end of the day. And so over the course of seven days, that hearing took place, and then the district court made those findings that there were no misstatements and that there was probable cause for the search warrant. The Court should not find that the sentencing guidelines are unconstitutional based on the Supreme Court's decisions in Mestreda and in Booker. It is clear that these guidelines have withstood the scrutiny by that court, and no appellate court that the government is aware of has taken it upon itself to strike down the guideline provisions at issue here. It's always a first, right? The Ninth Circuit has occasionally done things that other courts haven't done yet. My question seriously was not on constitutionality, but it was about the judge's discretion or, you know, the judge kind of parrot's discretion. But then he basically makes this comment, which I wrote down because it kind of struck me as significant. And he says, we don't make law, we don't write it, but, you know, we owe comedy. And the way I read that is almost like saying, okay, well, here we go. They handed these things down on I, and I'm a district judge. I don't write the law. I don't make it. I just got to owe deference to this. I really wonder if this isn't a case like Henderson, where it's unclear whether the judge exercised his discretion to say, look, I'm fine with these, or whether in fact he's given us some indication that he thought he really couldn't override these guidelines. I appreciate your comment. Sure. It's apparent to the government that the district court did not view the guidelines as mandatory, and he addressed every argument that the defendant had raised at that point about the guidelines, and said that the guidelines were simply advisory, that there's simply one factor that the court had to consider, that the court had to properly calculate the range, which it did, and then to apply those as simply one factor among all of the others at 3553A. And I think, I mean, I would be speculating to know what did he mean by that sense of we owe comity. What I think is that, and I know from experience, that this district court judge had departed in numerous other cases in both directions, and many times had, as he did in this case, sentenced within the guideline range. And I think he noted that the probation office here recommended a sentence within the range and gave some deference to that. But in no way did this judge feel constrained that he had to follow a guideline sentence. I think he looked and painstakingly went through in much more detail than arguably he had to in terms of what are the factors. Why am I choosing this sentence? And he went through the need to promote respect for the law, that it be sufficient but not greater than necessary to comply with the purposes of sentencing. He said that he knew that he could give a shorter sentence, but that this was the one, based on all of the facts and circumstances to that point in the sentencing hearing and the trial, that was the most reasonable. So this is not a situation where the judge was squarely presented with the issue of can I put aside the guidelines, can I disagree with them on policy grounds. He was never given that question, but I think even assuming that he had been, we could infer from the context that he knew that he had the authority to disagree with those guidelines, but that he didn't. But putting all that aside, that would just be one factor. So whatever his view is of the guidelines, he knows that he has to look at all the other statutory grounds. So I don't think that is analogous to what ambiguity was present in the district court decision in Henderson. Now, counsel, did the Feeney amendment amend the sentencing guidelines directly? My understanding is the Feeney amendment directed the commission to promulgate the guidelines. So it was actually a direction to the commission to amend its guidelines in a particular way rather than amending the guidelines directly. Correct. Okay. And I think that as a matter of law and procedure, that that is correct in that it's as the Sixth Circuit in the Bristline case acknowledged, that was within the proper authority of Congress to do because the legislature can establish and does establish the penalties. And if they want to delegate part of that responsibility to the sentencing commission, they can, but that the mechanism by which it was done through the Feeney amendment was not improper. Did the government make a sentencing recommendation? I'm sorry. Did the government make a sentencing recommendation to the district court? In this case. In this case. Yes. Do you recall what it was? I believe that it was at the high end of the range. That's sort of what I had recalled, too. And I have to say, and I don't say there's a lot of traction to this, but this seems like a pretty stiff sentence. I mean, we get an unfortunate number of these cases. And as violations go, the number of images and so forth here, not as substantial as we've seen, or I've seen at least, in a lot of other cases. And I guess I'm sort of curious, I could go back and look, but I haven't, is there something that drove this higher that maybe isn't apparent in what we have immediately before us? Is there something in the record? I mean, the government asked, imposed, proposed a very heavy sentence, high end of the guideline range. We got a sentence that was low end of the guideline range. And I just can't help but wondering, is there something else out there that I haven't figured out that might explain why it is the judge just didn't think this was an appropriate case to depart or didn't express a policy disagreement? Again, I'd be speculating. But I think that when you look at the record, and certainly I can explain what the government's rationale was, that when you do the guideline calculation, he got the enhancements for use of the computer, images of prepubescent minors, images depicting violence or sadistic or masochistic conduct, and there was a number of images enhancement. And it was the receipt-based offense level. What he also got was a two-level upward adjustment for abuse of position of trust. And that's not an enhancement that typically applies in child pornography cases. If it applies generally, it's very uncommon. And then there was no acceptance of responsibility. So those two last factors alone would account for a five-level increase. And so if you took those things out and you were sentenced, even if it were under the statute, it would actually last probably something more in the range of seven or eight years, which is more typical. But as the court noted, that whatever sentence he imposed, it would be unacceptable to the defendant because the defendant had failed to acknowledge responsibility even after the jury had spoken and found him guilty. So the district court did acknowledge all of the family support, the 33 letters, the other good things about the defendant. But then he also, I think, tried to put this into the context of other cases that he had sentenced. And some of those were as high as 300 months. Or Can I just go back? Did you say he was at the high end of the guideline range? This sentence was at the low end. Low end. That's what I thought. The government's recommendation was the high end. Yeah. I just thought I misheard what you said. That's what my understanding was. He was at the bottom of the guideline. Correct. And so that is, in the government's view, a significant point because I believe that the Supreme Court has indicated that a sentence within the guideline range, although obviously in this circuit it's not presumptively reasonable, is something that is due some deference, particularly where it is at the bottom of the guideline range. But the only issue remaining is the ineffective assistance of counsel claim. We don't believe that the Court, based on its precedent, should entertain that argument. But if it's so inclined, we didn't brief this, but if the Court were inclined, we think that the record would support the claim being denied. But under the Court's precedent, generally the presumption is that we don't examine those claims on direct review, and in this case we see why, because the impugned counsel has not had an opportunity to explain what appear to be very strategic decisions, the things that the counsel on appeal has complained about in the government's view involve judgment calls about why a defense was presented or wasn't presented and different tactics. So what the district court did note is that, and this is in the excerpts of record we provided the part of the transcript that supports this, that under the circumstances we believe we had highly competent, prepared advocates in a highly, highly disputatious case. The Court found, I am confident the jury was not improperly influenced by the conduct of any lawyer. The defendant was given more than due process. He had an exceedingly competent, highly, highly experienced attorney who left no stone unturned and who essentially, I think, thought every point that could have been raised, both legally and factually, strategically and every other way, and that's in the excerpts of record number 14 at 443 to 444. So in the government's view, there was no ineffective assistance. There was vigorous representation. It's apparent given the volume of the record where there were numerous pretrial motions, the seven-day Frank suppression hearing, the 27-court-day trial, two days of motions for new trial, two days of sentencing, all of which during that 32-month period, the defendant's attorney represented him at every step of the way, the retention of a paid computer forensic expert, other witnesses that they put on, that as the Court found, there was no ineffective assistance. So unless the Court has any other questions. Thank you. Thank you. We've used your time, but I'll give you a minute for rebuttal. One minute? So much to address. Why don't you pick your most important point? Yes. I'm going to pick the comedy issue because that was important to me and I didn't get to it. And what the district court stated in full is that there has been discussion on both sides about Congress's intent and Congress's purpose, and whether or not this is politicizing or inappropriately infringing on the coordinate branch of government of the judiciary in attempting to either usurp or to limit sentencing discretion. And in viewing these laws, as both sides have noted, because it is the legislative history and the stated purpose in the congressional record, based on the committee commentary on the bills as they were passed, that the Congress of the United States has increasingly viewed the exploitation and abuse of children, particularly on the Internet, as a crime that is increasing in its danger to the community and the harm that it actually visits on the victims and their family. And so there is no question that the penalties are becoming more severe and that the collateral consequences of these crimes are increasing. But this reflects the considered judgment of the legislature and the executive, because it is the executive who prosecutes these crimes. And his statement about comedy was that courts cannot impose a sentence due to respect for other branches of the ---- that's my argument, they cannot impose sentences due to respect for other branches of government. And the district court stated, as a coordinate branch of government, we don't make law, we don't write it, and we do owe comedy and respect to the legislative branch of government. In terms of his ---- the credibility at issue with the overbroad questioning at the Franks hearing. I think you've gone over that. You've expired your time. All right. Thank you very much. Appreciate your argument. Appreciate it. Thank both counsel for your argument this morning. The United States has responded. Submitted in order.
judges: McKeown, Clifton, Bybee